## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **NETLIST, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **SAMSUNG ELECTRONICS CO., LTD.,** | ) | |
| **SAMSUNG ELECTRONICS AMERICA,** | ) | |
| **INC., SAMSUNG SEMICONDUCTOR,** | ) | Civil Action No. 2:25-cv-748 |
| **INC., AVNET, INC.** | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

| | | |
|---|---|---|
| **NETLIST, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **MICRON TECHNOLOGY, INC.;** | ) | |
| **MICRON SEMICONDUCTOR** | ) | |
| **PRODUCTS, INC.; MICRON** | ) | Civil Action No. 2:25-cv-749 |
| **TECHNOLOGY TEXAS LLC; AVNET,** | ) | |
| **INC.,** | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## SECOND AMENDED COMPLAINT

1.       Plaintiff Netlist, Inc. ("Netlist"), by its undersigned counsel, brings this Second

Amended Complaint against Defendants Samsung Electronics Co., Ltd. ("SEC"), Samsung

Electronics America, Inc. ("SEA"), Samsung Semiconductor, Inc. ("SSI" and, together with SEC

and SEA, "Samsung"), and Avnet, Inc. ("Avnet" and, together with Samsung, "Defendants") for Defendants' infringement of U.S. Patent Nos. 12,373,366 (the "'366 Patent") and 10,268,608 (the "'608 Patent") (collectively, "Asserted Patents" or "Patents-in-Suit").

## I.    **THE PARTIES**

2.      Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 111 Academy Way, Suite 100, Irvine, CA 92617.

3.      On information and belief, SEC is a corporation organized and existing under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon, Gyeonggi-Do, 443-742, Republic of Korea.  On information and belief, SEC is the worldwide parent corporation for SEA and SSI, and is responsible for the infringing activities identified in this Complaint.  On information and belief, SEC's Device Solutions division is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, SEC is also involved in the design, manufacture, and provision of products sold by SEA.

4.      On information and belief, SEA is a corporation organized and existing under the laws of the State of New York.  On information and belief, SEA, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  Defendant SEA maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  SEA may be served with process through its registered agent for service in Texas: CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.  SEA is a wholly owned subsidiary of SEC.

5.      On information and belief, SSI is a corporation organized and existing under the laws of the State of California.  On information and belief, SSI, collectively with SEC, operates the Device Solutions division, which is involved in the design, manufacture, use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, Defendant SSI maintains facilities at 6625 Excellence Way, Plano, Texas 75023.  Defendant SSI may be served with process through its registered agent National Registered Agents, Inc., 1999 Bryan St., Ste. 900, Dallas, TX 75201.  On information and belief, SSI is a wholly owned subsidiary of SEA.

6.      On information and belief, Avnet is a corporation organized and existing under the laws of the State of New York.  On information and belief, Avnet is involved in the use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.  On information and belief, Avnet has a regular and established place of business at 3101 E. President George Bush Highway, Suite 250, Richardson, TX 75082.  On information and belief, Avnet is registered with the Texas Secretary of State to do business in Texas.  On information and belief, Avnet can be served through its registered agent, The Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas, 78701-3218.

7.      On information and belief, Defendants have used, sold, or offered to sell products and services, including the Accused Instrumentalities, in this judicial district.

## II.    <u>JURISDICTION AND VENUE</u>

8.      Subject matter jurisdiction is based on 28 U.S.C. § 1338, in that this action arises under Federal statute, the patent laws of the United States (35 U.S.C. §§ 1, *et seq.*). While supplemental jurisdiction would not independently exist over the state law claims raised herein, supplemental jurisdiction pursuant to 28 U.S.C. § 1367 is appropriate here over the Fifth and Sixth claims for declaratory relief based on the common nucleus of operating facts forming the same

case or controversy as the declaratory judgment claims based on Section 2 of the Sherman Act, 15 U.S.C. § 2 in Claims Three and Four. Indeed, Samsung has repeatedly pled that supplemental jurisdiction under 28 U.S.C. § 1367 exists over its own breach of contract claim when paired with a declaratory judgment claim of non-infringement of the same patent. *See Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:21-cv-1453 (D. Del.). D.I. 1, ¶ 8 ("The breach of contract claim forms part of the same case or controversy as the claims for declaratory judgment of non-infringement and unenforceability asserted by Samsung in this action."); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No 23-1122 (D. Del.). D.I. 1, ¶ 9 (same); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No 24-614 (D. Del.). D.I. 15, ¶ 9 (same); *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 25-1371 (D. Del.), D.I. 1. ¶ 9 (same). Thus, to the extent Samsung is correct, then this Court has supplemental jurisdiction over this declaratory judgment claim.

9.     Each Defendant is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

10.     Personal jurisdiction exists generally over the Defendants because each Defendant has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the forum as a result of business conducted within the State of Texas and the Eastern District of Texas. Personal jurisdiction also exists over each Defendant because each, directly or through subsidiaries, makes, uses, sells, offers for sale, imports, ships, distributes, advertises, makes available, and/or markets products within the State of Texas and the Eastern District of Texas that infringe one or more claims of the Patents-in-Suit. Further, on information and belief, Defendants have placed or contributed to placing infringing products into the stream of commerce, both directly and through intermediaries (including distributors, retailers, authorized dealers, sales agents, and other individuals or entities), knowing or understanding that such products would be sold and used in the United States, including in this District. Moreover, Samsung has admitted that

its other similar breach of contract claims arise directly out of Netlist's "assertions of patents." *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:25-cv-1589 (D. Del.), D.I. 10-1. ¶ 19; *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 1:25-cv-1371 (D. Del.), D.I. 1. ¶ 2. Samsung specifically points to Netlist's assertions in the Eastern District of Texas of the '366, '608, and related patents for its own breach of contract claim in Delaware. C.A. No. 1:25-cv-1589, ¶¶ 205, 212; C.A. No. 1:25-cv-1371 (D. Del.), D.I. 1. ¶ 118. Netlist has asserted infringement of the '366 Patent and '608 Patent here as well as other patents, including related patents, within this District. *See Netlist, Inc. v. Samsung Elecs. Co.,* No. 2:21-cv-463 (E.D. Tex.); *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:22-cv-293 (E.D. Tex.); *see Netlist, Inc. v. Samsung Elecs. Co.,* No. 2:25-cv-557 (E.D. Tex.). This District and Texas is thus intertwined with this dispute between Netlist and Samsung. And Samsung purposefully availed itself of the protections of the laws of Texas and within this District by participating in those lawsuits underlying its breach of contract claims.

11.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b). Generally, venue is also proper in this District under 28 U.S.C. § 1391(b)–(c) because Defendants are all subject to personal jurisdiction in this District. In addition, under Section 1391(b)(3), Samsung has taken the position that there is no venue where "all necessary parties" can all be sued together for infringement and that SSI, SEA, and Netlist are all indispensable. *Samsung Elec. Co. v. Netlist, Inc.*, C.A. No. 25-626 (D. Del.)., D.I. 15 at 1-2, 9-10. Venue is also proper for Samsung because Samsung maintains a regular and established place of business in this District. For instance, SEC maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district. As another example, SEA maintains a regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district. Venue is also proper for SSI because it maintains a

regular and established place of business in this judicial district at 6625 Excellence Way, Plano, Texas 75023 and has committed acts of infringement in this judicial district.

12.     Samsung has not contested venue in this District.  *See, e.g.*, Answer ¶ 10, *Arbor Glob. Strategies LLC v. Samsung Elecs. Co.*, No. 2:19-cv-333, Dkt. 43 (E.D. Tex. Apr. 27, 2020); Answer ¶ 29, *Acorn Semi, LLC v. Samsung Elecs. Co.*, No. 2:19-cv-347, Dkt. 14 (E.D. Tex. Feb. 12, 2020).  Nor have Defendants contested venue in any of the prior actions between the Parties in this district.  *See Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-463 (E.D. Tex.) ("*Samsung I*"), *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-293 (E.D. Tex.) ("*Samsung II*"). To any extent that SEA alleges that it has not committed acts of infringement within this Eastern District of Texas under Section 1400(b) because it has no involvement with the Accused Instrumentalities or Samsung's DIMM products, a jury has also already found that SEA infringed the '918 and '054 Patents based on its DIMM products. On information and belief and to any extent SSI alleges that 6625 Excellence Way, Plano Texas 75023 is not its regular and established place of business under Section 1400(b), SSI (along with SEC) has ratified this location as a regular and established place of business and, in addition, SEC, SSI, and SEA have sufficiently disregarded corporate formalities or work so closely together to treat them as one for venue purposes. For instance, Samsung uses common signage on the building at 6625 Excellence Way that does not differentiate between SEC, SSI, and SEA.  And Samsung has a unified website for SEC, SEA, and SEA as well. Moreover, on information and belief, Samsung has a close, contractual relationship with its distributor and agent, Avnet, located within this District at 3101 E. President George Bush Highway, Suite 250, Richardson, TX 75082, also with sufficient interim control and agency to support patent venue.

13.     Venue is also proper for Avnet because it maintains a regular and established place of business in this judicial district at 3101 E. President George Bush Highway, Suite 250, Richardson, TX 75082 and has committed acts of infringement in this judicial district.

Specifically, Avnet offers for sale and distributes its products, including the Accused Instrumentalities supplied by Samsung, all throughout the United States, including the State of Texas and the Eastern District of Texas. Avnet's website, https://www.avnet.com/americas/, has an (800) contact number that prospective customers can call to obtain more information or a quote for the Accused Instrumentalities (and other products). Avnet's website also specifically targets customers in Texas, including those in the Eastern District of Texas, by providing region-specific email contact, including dallas@avnet.com.[1] Furthermore, Avnet's website advertises products for sale and lead times, including certain Accused Instrumentalities manufactured by Samsung, as shown below:



14.     Therefore, Samsung, together with Avnet as the distributor of the Accused Instrumentalities, have offered to sell, have sold, and have intentionally and voluntarily placed infringing products into the stream of commerce with the expectation and understanding that those products will be sold, purchased, and/or used by its customers in the State of Texas, including the Eastern District of Texas.

---

[1] *Locations: Avnet Americas*, Avnet (last visited July 28, 2025), https://www.avnet.com/americas/about-avnet/locations/.

[2] *Products*, Avnet (last visited July 28, 2025), https://www.avnet.com/americas/products/c/search?search=Samsung%20DDR5&page=1&limit=20&orderby=&orderbydirection=asc&__c_HomeTabList=PLT.

III.    **FACTUAL ALLEGATIONS**

    A.    **Background**

15.    Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies.  Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing markets.  Netlist's technology enables users to derive useful information from vast amounts of data in a shorter period of time.  These capabilities will become increasingly valuable as the volume of data continues to dramatically increase.  Netlist has secured multiple jury verdicts confirming the commercial success of its inventions.  For example, in 2023, a jury in the Eastern District of Texas found that Samsung willfully infringed five Netlist patents and awarded Netlist $303.15 million in damages.  *See* Verdict at 7, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-463, Dkt. 479 (E.D. Tex. Apr. 21, 2023).  As another example, in May 2024, a jury in the Eastern District of Texas awarded Netlist $445 million in damages against Micron, another dominant memory module manufacturer.  *See* Verdict at 5, *Netlist, Inc. v. Micron Tech., Inc.*, No. 2:22-cv-294, Dkt. 135 (E.D. Tex. May 23, 2024).  And in November 2024, a jury found that Samsung willfully infringed three Netlist patents and awarded Netlist $118 million in damages.  *See* Verdict at 7, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:22-cv-293, Dkt. 847 (E.D. Tex. Nov. 22, 2024).

16.    Netlist has a long history of being the first to market with disruptive new products such as the first load-reduced dual in-line memory module ("LRDIMM"), HyperCloud®, based on Netlist's distributed buffer architecture later adopted by the industry for DDR4 LRDIMM.  Netlist was also the first to bring NAND flash to the memory channel with its NVvault® NVDIMM.  Netlist's pioneering NVDIMM products utilized the same on-module power management technology found on newer-generation DDR5 DIMMs.  These innovative products built on Netlist's early pioneering work in areas such as embedding passives into printed circuit

boards to free up board real estate, doubling densities via quad-rank double data rate (DDR) technology, and other off-chip technology advances that result in improved performance and lower costs compared to conventional memory.

17.    In many commercial products, a memory module is a printed circuit board that contains, among other components, a plurality of individual memory devices (such as DRAMs). The memory devices are typically arranged in "ranks," which are accessible by a processor or memory controller of the host system.  A memory module is typically installed into a memory slot on a computer motherboard.

18.    Memory modules are designed for, among other things, use in servers such as those supporting cloud-based computing, artificial intelligence, and other data-intensive applications, as well as in consumer applications such as PCs and laptops.  Memory modules are typically characterized by, among other things, the generation of DRAM on the module (*e.g.*, DDR5, DDR4, DDR3) and the type of module (*e.g.*, UDIMM, SODIMM, RDIMM).

**B.    U.S. Patent No. 12,373,366**

19.    The '366 Patent is entitled "Memory with On-Module Power Management."

20.    Netlist owns by assignment the entire right, title, and interest in and to the '366 Patent.  The '366 Patent was filed as Application No. 17/582,797 on January 24, 2022, issued as a patent on July 29, 2025 and claims priority to, among others, U.S. Application No. 13/559,476 filed on July 26, 2012; U.S. Application No. 12/240,916 filed on September 29, 2008; U.S. Application No. 12/131,873 filed on June 2, 2008; as well as to two provisional applications, filed on June 1, 2007 (No. 60/941,586) and July 28, 2011 (No. 61/512,871).

21.    Samsung had pre-suit knowledge of the '366 Patent no later than May 17, 2022. *See Samsung Elecs. Co. Ltd. v. Netlist, Inc.*, IPR2022-00996, Paper 1.  Samsung also gained knowledge of the '366 Patent via this Complaint.

22.    Claim 1 of the '366 Patent provides:

[**1pre**] A dual in-line memory module (DIMM) configured to fit into a memory slot connector of a system board of a computer system, the memory slot connector including a set of power conduits, a set of data conduits, and a set of address and control conduits, wherein data signals are transferred between the system board and the DIMM via the set of data conduits, and address and control signals are delivered from the system board to the DIMM via the set of address and control conduits, the DIMM comprising:

[**1a**] a printed circuit board (PCB) having edge connections configured to fit into the memory slot connector of the system board, the PCB including:

> a first set of edge connections configured to be electrically connected to the set of power conduits and operable to deliver to the DIMM power from power rails of the system board via the set of power conduits, wherein the power delivered to the DIMM from the power rails of the system board is the only power received by the DIMM;

> a second set of edge connections configured to be electrically connected to the set of data conduits, and

> a third set of edge connections configured to be electrically connected to the set of address and control conduits,

> a set of voltage supply lines electrically connected to the first set of edge connections and configured to receive the power delivered to the DIMM from the power rails of the system board by way of the memory slot connector of the system board and the first set of edge connections of the DIMM,

> a set of data lines electrically connected to the second set of edge connections, and

> a set of address and control lines electrically connected to the third set of edge connections;

[**1b**] a controller including a voltage monitor circuit and nonvolatile memory, the controller coupled to the PCB and to an input voltage supply line of the set of voltage supply lines, the voltage monitor circuit configured to:

> (i) monitor an input voltage supplied via the input voltage supply line;

> (ii) generate a trigger signal upon detecting a trigger condition; and

> (iii) transmit the trigger signal to at least one other portion of the controller, wherein the controller is configured to perform, in response to the trigger signal, a write operation to write data into the nonvolatile memory, and wherein the trigger condition occurs when the input voltage exceeds a first

threshold voltage;

[**1c**] a set of components coupled to the PCB, the set of components including a plurality of double data rate (DDR) synchronous dynamic random access memory (SDRAM) devices coupled to the set of address and control lines and to the set of data lines, the DDR SDRAM devices being operable to receive or output data signals via the set of data lines based on address and control signals received from the system board via the set of address and control lines; and

[**1d**] first, second, third, and fourth converter circuits coupled to the PCB and to the input voltage supply line, and configured to receive power from the input voltage supply line and to deliver power via first, second, third, and fourth regulated voltage lines,

wherein the set of components includes:

a first component configured to receive power via at least the first regulated voltage line;

a second component configured to receive power via at least the second regulated voltage line;

a third component configured to receive power via at least the third regulated voltage line; and

a fourth component configured to receive power via at least the fourth regulated voltage line;

wherein each component of the set of components:

(i) is electrically connected to one or more of the first, second, third, and fourth regulated voltage lines; and

(ii) receives power only via the one or more of the first, second, third, and fourth regulated voltage lines,

[**1e**] wherein the plurality of DDR SDRAM devices includes:

a first group of at least five DDR SDRAM devices that are each connected to a first chip select line configured to electrically conduct a first chip select signal;

a second group of at least four DDR SDRAM devices that are each connected to a second chip select line configured to electrically conduct a second chip select signal;

wherein when power from the power rails of the system board is provided to the DIMM and each group of the first and second groups of DDR

SDRAM devices is not in self-refresh mode:

- the first group of DDR SDRAM devices is configured to be enabled, in response to the first chip select signal, to receive or output at least 40 1-bit DDR data signals in parallel via at least 40 data lines of the set of data lines independently of whether the second group of DDR SDRAM devices is enabled, in response to the second chip select signal, to receive or output an integer number of 1-bit DDR data signals in parallel via an integer number of data lines of the set of data lines;

- the at least 40 1-bit DDR data signals include at least 32 1-bit wide DDR data signals and at least eight 1-bit DDR error-correcting code (ECC) data signals; and

wherein the sum of the at least 40 data lines and the integer number of data lines equals a total number of data conduits of the set of data conduits of the memory slot connector, and the total number of data conduits is at least 72 data conduits.

## C.    U.S. Patent No. 10,268,608

23.    The '608 Patent is entitled "Memory Module with Timing-Controlled Data Paths in Distributed Data Buffers."

24.    Netlist owns by assignment the entire right, title, and interest in and to the '608 Patent.  The '608 Patent was filed as Application No. 15/820,076 on November 21, 2017, issued as a patent on April 23, 2019, and claims priority to, among others, a utility application filed on July 27, 2013 (No. 13/952,599) and a provisional application filed on July 27, 2012 (No. 61/676,883).

25.    Samsung had pre-suit knowledge of the '608 Patent no later than August 2, 2021 via its access to Netlist's patent portfolio docket. Samsung has also gained knowledge of the '608 Patent via the Netlist's litigation against Samsung regarding a patent in the same family, U.S. Patent No. 10,860,506, which is a continuation of the '608 patent. Netlist filed the lawsuit on December 20, 2021. *Netlist, Inc. v. Samsung Elec. Co. Ltd., et. al.*, No. 21-cv-463-JRG Dkt. 1 (E.D. Tex. Dec. 20, 2021).  Samsung also gained knowledge of the '608 Patent through the filing

of the complaint in *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:22-cv-293. In that case, a jury found Samsung to been an adjudicated willful infringer of a number of Netlist's patent. *Id.*, Dkt. 847, Verdict Form (E.D. Tex. Nov. 22, 2024). On information an belief, Samsung gained knowledge of its infringement of the '608 Patent when it released the Accused DDR5 DIMMs. Samsung also gained knowledge of the '608 Patent and its infringement via this Complaint.

26.    Claim 1 of the '608 Patent provides:

[**1pre**] A memory module operable to communicate with a memory controller via a memory bus, the memory bus including signal lines, the signal lines including a set of control/address signal lines and a plurality of sets of data/strobe signal lines, the memory module comprising:

[**1a**] a module board having edge connections for coupling to respective signal lines in the memory bus:

[**1b**] a module control device mounted on the module board and configured to receive system command signals for memory operations via the set of control/address signal lines and to output module command signals and module control signals in response to the system command signals, the module control device being further configured to receive a system clock signal and output a module clock signal; and

[**1c**] memory devices mounted on the module board and configured to receive the module command signals and the module clock signal, and to perform the memory operations in response to the module command signals, the memory devices including a plurality of sets of memory devices corresponding to respective sets of the plurality of sets of data/strobe signal lines; and

[**1d**] a plurality of buffer circuits corresponding to respective sets of the plurality of sets of data/strobe signal lines, wherein each respective buffer circuit of the plurality of buffer circuits is mounted on the module board, coupled between a respective set of data/strobe signal lines and a respective set of memory devices, and configured to receive the module control signals and the module clock signal, the each respective buffer circuit including a data path corresponding to each data signal line in the respective set of data/strobe signal lines, and a command processing circuit configured to decode the module control signals and to control the data path in accordance with the module control signals and the module clock signal, wherein the data path corresponding to the each data signal line includes at least one tristate buffer controlled by the command processing circuit and a delay circuit configured to delay a signal through the data path by an amount determined by the command processing circuit in response to at least one of the module control signals.

### D.    Defendants' Infringing Activities

27.    Samsung is a global technology company and one of the largest manufacturers of semiconductor memory products such as DRAM, NAND Flash, and MCP (Multi-Chip Package). Samsung develops, manufactures, sells, offers to sell, and imports into the United States memory components and memory modules designed for, among other things, use in servers such as those supporting cloud-based computing, artificial intelligence, and other data-intensive applications as well as use in consumer applications such as in PCs, laptops, and gaming.

28.    Samsung and Netlist were initially partners under a 2015 Joint Development and License Agreement ("JDLA").  Samsung used Netlist's technologies to develop products both in mature markets such as those for DDR4 memory modules and emerging markets for new generations of DRAM technologies, including DDR5.  Under the JDLA, Samsung was obligated to supply Netlist certain memory products at competitive prices.  Samsung, however, did not honor its promises and repeatedly failed to fulfill Netlist's product orders.  As a result, Netlist terminated the JDLA on July 15, 2020, which termination was found effective by a federal district court in the Central District of California in 2021.  *See* Order at 22, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 8:20-cv-993, Dkt. 186 (C.D. Cal. Oct. 14, 2021).

29.    Samsung appealed that decision, and the Ninth Circuit partially reversed the district court's summary judgment ruling.  Following remand, the contract action in the Central District of California proceeded to a jury trial.  On May 17, 2024, the jury returned a verdict finding that Netlist's interpretation of the JDLA's supply provision was correct, and Samsung's breach of that provision was material.  *See* Verdict, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 8:20-cv-993, Dkt. 556 (C.D. Cal. May 17, 2024).

30.    Upon Samsung's motion, the district court vacated the jury's verdict and ordered a new trial.  That trial took place in March 2025.  Again, the jury returned a verdict finding that

Netlist's interpretation of the JDLA's supply provision was correct. *See* Verdict, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 8:20-cv-993, Dkt. 769 (C.D. Cal. Mar. 24, 2025). Samsung's latest motion for a new trial is currently pending. *See* Order, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 8:20-cv-993, Dkt. 810 (C.D. Cal. July 17, 2025) (scheduling evidentiary hearing regarding Samsung's motion for a new trial for July 30, 2025).

31.    In April 2023, a jury in the Eastern District of Texas found that Samsung willfully infringed five Netlist patents and awarded Netlist $303.15 million in damages, including $147,225,000 for U.S. Pat. Nos. 11,016,918 and 11,232,054—asserted against Samsung's DDR5 memory modules. *See* Verdict at 7, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-463, Dkt. 479 (E.D. Tex. Apr. 21, 2023).

32.    Avnet "is one of the largest distributors of electronic components, computer products and embedded technology."[3]  As an authorized distributor of Samsung memory products,[4] Avnet "accelerates its partners' success by connecting the world's leading technology suppliers with a broad base of customers by providing cost-effective, value-added services and solutions."[5] Avnet is involved in the use, offering for sale and/or sales of certain semiconductor products, including the Accused Instrumentalities as defined below.

### E.    DDR5 Memory Modules

33.    The Accused DDR5 Products include, without limitation, any Samsung DDR5 products made, sold, offered for sale, used and/or imported into the United States by Defendants. By way of non-limiting example, the accused DDR5 memory modules include Samsung's DDR5

---

[3] *Avnet, Inc. Names Rodney C. Adkins to Its Board of Directors*, SEC (June 15, 2015), https://www.sec.gov/Archives/edgar/data/8858/000129993315000942/exhibit1.htm.

[4] *Samsung*, Avnet (last visited July 28, 2025), https://www.avnet.com/americas/manufacturers/m/samsung/.

[5] *Avnet, Inc. Names Rodney C. Adkins to Its Board of Directors*, *supra*.

RDIMMs, including MRDIMMs, and other products with similar structures and features.  As further example, the Accused Instrumentalities include, without limitation, any DDR5 products made, sold, offered for sale, used and/or imported into the United States by Samsung, including those modules utilizing Samsung's own power management IC, including at least PMIC components having the following part numbers: S2FPC01, S2FPD01, and S2FPD02.[6]  The Accused DDR5 Products also include any DDR5 products sold, offered for sale, used and/or imported into the United States by Samsung that include PMICs supplied by third parties.

34.    Each of the DDR5 memory modules includes a plurality of connections at the edge through which command/address signals are received from a memory controller of the host computer system and data is exchanged with the memory controller.

35.    DDR5 memory modules introduced important upgrades over DDR4 modules.  For example, it introduced the feature of two 40-bit (32 data bits plus 8 ECC bits) channels that can operate independently.  This feature, combined with a new default burst length of 16 in the DDR5 component allows a single burst to access 64B of data in a typical CPU cache line using only one of the independent channels which in turn permits interleaving accesses from the two independent channels.  This leads to significant improvement in concurrency, bandwidths and performance.

36.    To accommodate increased data rates, DDR5 memory modules also moved the power management from the motherboard onto the module itself, leading to more precise voltage control needed for high data rates as well as a reduction in power loss.  Samsung notes on its website that its DDR5 modules include an "on-DIMM PMIC" that "further boosts power

---

[6] *See, e.g.*, *Product Brief: S2FPD01 Power IC*, Samsung (2022), https://download.semiconductor.samsung.com/resources/brochure/S2FPD01%20Power%20IC.pdf.

management efficiency and power supply stability."[7]    Furthermore, "[o]ne major design improvement to the newest generation DRAM solution involves integrating the PMIC into the memory module—previous generations placed the PMIC on the motherboard—offering increased compatibility and signal integrity, and providing a more reliable and sustained performance."[8]

37.    MRDIMMs are multiplexed rank dual in-line memory modules.

**F.    Compliance with Contract and Competition Law**

38.    Based on the assertion of the patents in suit, Samsung has made a series of allegations.

39.    On information and belief, Samsung alleges that Netlist made no technical contributions to the JEDEC standards that infringe Netlist's patents, that Netlist patented technologies invented by other JEDEC members through improper derivation, and that Netlist failed to disclose those patents to JEDEC until the industry adopted Netlist's patented technology.

40.    On information and belief, Samsung alleges that Netlist asserted its patents as standard-essential and that Netlist exploited its supposed monopoly power by refusing to license its patents under RAND terms and that it did not intend to meet its RAND commitments.

41.    On information and belief, Samsung further alleges that Netlist knowingly asserted invalid patents in litigation against Samsung and improperly sought injunctive relief against Samsung for infringement of Netlist's Standard Essential Patents.

42.    Samsung has unsuccessfully made similar arguments alleging the same facts previously before this Court.

---

[7] *DDR5 Ushers in Data-Centric Innovation*, Samsung (last visited July 28, 2025), https://semiconductor.samsung.com/dram/ddr/ddr5/.

[8] *Samsung Unveils New Power Management Solutions for DDR5 Modules*, Samsung (May 18, 2021), https://news.samsung.com/global/samsung-unveils-new-power-management-solutions-for-ddr5-modules.

43.     For example, Samsung asserted defenses of laches, estoppel, and/or waiver, and inequitable conduct, in Case Nos. 2:21-cv-00463 ("*EDTX I*") and 2:22-cv-00293 ("*EDTX II*") for Netlist's alleged noncompliance with RAND obligations and with JEDEC's disclosure obligations, and for Netlist's alleged failure to disclose JEDEC prior art in patent prosecution. *See* Answer to First Am. Compl. at 39, 44–51, *EDTX I*, No. 2:21-cv-00463 (E.D. Tex. May 18, 2022), Dkt. No. 25; Answer to Third Am. Compl. at 22–23, 28–44 *EDTX II*, No. 2:22-cv-00293 (E.D. Tex. Sept. 11, 2023), Dkt. No. 145.

44.     The JEDEC Patent Policy obligates licensing only "Essential Patent Claims" on RAND terms. JEDEC defines "Essential Patent Claims" as claims that "would necessarily be infringed by" complying with "a final approved JEDEC standard." In other words, only patent claims that are actually essential to a JEDEC standard must be licensed on RAND terms.

45.     Samsung conceded in *EDTX I* that none of the patents-in-suit were standard essential. EDTX I, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; *see also id.*, at 147:1-6 ("[The Court: there are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *see also EDTX II*, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."). As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard. *EDTX I*, Dkt. 550, at 25. Compliance with JEDEC standards is immaterial to Samsung's infringement of Netlist's patents.

46.     Samsung's repeatedly claims that the parents-in-suit are not standard essential. Samsung's repeatedly claims that it does not infringe Netlist's patents through Samsung's design, manufacture, use, importation, offering for sale, and/or sales of certain semiconductor products,

including the Accused Instrumentalities and related products, which are JEDEC standard compliant, meaning there is no RAND obligation the patents are not infringed.

47.    Netlist has complied with all RAND obligations regardless of whether its patents are essential.

48.    Even if Samsung had a RAND license to Netlist's patents, those rights were eliminated by Samsung's bad faith, including its material breach of the JDLA and its willful infringement of Netlist's patents.

49.    Samsung has been found in material breach of the JDLA, thus eliminating any right Samsung would have had to a RAND license, if one existed. *See* Verdict Form, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 20-cv-993 (C.D. Cal. May 17, 2024), Dkt. No. 556.

50.    Samsung is an adjudicated willful infringer of a number of Netlist's patents, including the Asserted '608 Patent and two parent patents to the '366 Patent. *See* Verdict Form, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-463 (E.D. Tex. Apr. 21, 2023), Dkt. No. 479; Verdict Form, *Netlist, Inc. v. Samsung Elecs. Co.*, No. 2:22-cv-293 (E.D. Tex. Nov. 22, 2024), Dkt. No. 847.

51.    Therefore, Samsung lost any right to have a RAND license to Netlist's patents, if a right ever existed.

52.    Because Samsung maintains the Patents-in-Suit are not essential to any JEDEC standard, Netlist had no obligation to disclose either patent to JEDEC or its members. *Cf.* Order on Pretrial Motions, *EDTX I*, No. 2:21-cv-00463 (E.D. Tex. Apr. 5, 2023), Dkt. No. 432 (granting Netlist's motion *in limine* to "[p]reclude Samsung from presenting any allegations that Netlist has failed to comply with JEDEC obligations").

53.    The Court has rejected Samsung's equitable defenses arising from these same facts. *See* Memorandum Opinion and Order, *EDTX I*, No. 2:21-cv-00463 (E.D. Tex. Aug. 11, 2023),

Dkt. No. 550; *cf.* Final Judgment, *EDTX II*, No. 2:22-cv-00293 (E.D. Tex. Dec. 2, 2024), Dkt. No. 855.

54.    Any coercive claims relating to the above are compulsory and must be brought by Samsung in this action.

## IV.    FIRST CLAIM FOR RELIEF – '366 Patent

55.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

56.    Upon information and belief, Defendants directly infringed and are currently infringing at least one claim of the '366 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the Accused DDR5 DIMMs, and other products with materially the same structure in relevant part. For example, and as shown below, the accused DDR5 RDIMMs and other products with materially the same structures in relevant parts infringe at least one claim of the '366 Patent.

57.    The allegations below are based upon Netlist's current information and belief. Internal documentation from Defendants, including confidential Samsung product specifications and source code, will show infringement.  The examples provided below are not intended to be, and should not be understood as, limiting in any way.

58.    To the extent the preamble is limiting, the Accused DDR5 Products are DIMMs "configured to fit into a memory slot connector of a system board of a computer system, the memory slot connector including a set of power conduits, a set of data conduits, and a set of address and control conduits, wherein data signals are transferred between the system board and the DIMM via the set of data conduits, and address and control signals are delivered from the system board to the DIMM via the set of address and control conduits."

59.    For example, a Samsung DDR5 RDIMM module fits into a memory slot connector of a system board of a computer system, the memory slot connector including a set of power conduits [*e.g.*, Vin_Bulk, Vin_Mgmt, and VSS], a set of data conduits [*e.g.*, DIMM's memory channels (A and B)], and a set of address and control conduits [*e.g.*, Command and Address (CA) Bus], wherein data signals are transferred between the system board and the DIMM via the set of data conduits, and address and control signals are delivered from the system board to the DIMM via the set of address and control conduits.

 [9]

60.    The Accused DDR5 Products are DIMMs comprising "a printed circuit board (PCB) having edge connections configured to fit into the memory slot connector of the system board."

---

[9] Michael Larabel, *DDR5 Memory Channel Scaling Performance with AMD EPYC 9004 Series*, Phoronix (Jan. 6, 2023), https://www.phoronix.com/review/ddr5-epyc-9004-genoa (describing "performance across varying numbers of populated DDR5 memory channels" and noting that "[a]ll of the memory was 64 GP DDR5-4800MT/S Samsung . . . memory modules[.]").

61.     For example, a Samsung DDR5 RDIMM comprises a PCB that includes edge connections, *i.e.*, "gold fingers," that fit into the memory slot connector of the system board, as shown below:



62.     The Accused DDR5 Products contain a PCB that includes "a first set of edge connections configured to be electrically connected to the set of power conduits and operable to deliver to the DIMM power from power rails of the system board via the set of power conduits, wherein the power delivered to the DIMM from the power rails of the system board is the only power received by the DIMM."

63.     For example, as shown below,[11] a Samsung DDR5 RDIMM's PCB includes a first set of edge connections (*e.g.*, at pins specifically configured for receiving power and ground

---

[10] *RDIMM*, Samsung (last visited July 28, 2025), https://semiconductor.samsung.com/dram/module/rdimm/.

[11] *Memory VR Changes in the System by DDR5 Adoption*, Samsung Electro-Mechanics (Mar. 29, 2022), https://www.samsungsem.com/global/newsroom/news/view.do?id=5026.

supplies) configured to be electrically connected to the set of power conduits and operable to deliver to the DIMM power from the power rails of the system board via the set of power conduits. The DIMM power supply is delivered from the system to the PMIC.



**Need to support 12V power line inside motherboard**

Voltage converter for memory was located in the system and converts 12V to 1.2V and delivers power to DIMM socket directly. But 12V power line is directly connected to DIMM socket from DDR5 and built in VR converts to 1.1V, which delivers power to DRAM. As VR disappears from system, the system design has the advantage of being simplified, but on the contrary, the memory module need a lot of components. As such, the number of various components such as PMIC, Power Inductor, and MLCC will increase. From a server and network system designer's point of view, power line voltage from PSU to DIMM socket will be increased from 1.2V to 12V, so the system needs new 25V MLCC which need to be located as close to the DIMM socket as possible.

Figure2. DDR4 Based-system vs DDR5 Based-system

64.    The Accused DDR5 Products contain a PCB that includes "a second set of edge connections configured to be electrically connected to the set of data conduits" (*e.g.*, pins for DQ and ECC signals) and "a third set of edge connections configured to be electrically connected to the set of address and control conduits" (*e.g.*, edge connections for address and control signals).

65.    The Accused DDR5 Products also contain a PCB that includes "a set of voltage supply lines electrically connected to the first set of edge connections and configured to receive the power delivered to the DIMM from the power rails of the system board by way of the memory slot connector of the system board and the first set of edge connections of the DIMM," such as

a set of voltage supply lines that are electrically connected to the first set of edge connections (power and ground pins) and configured to receive the power delivered to the DIMM from the power rails of the system board by way of the memory slot connector of the system board when the DIMM is fitted into the memory slot connector.

66.    The Accused DDR5 Products contain a PCB that includes "a set of data lines [*e.g.*, DQ and error check bit lines] electrically connected to the second set of edge connections [*e.g.*, pins for data (DQ) and error check bits]."

67.    For example, a Samsung DDR5 RDIMM's PCB includes data lines that are electrically connected to the second set of edge connections.  That is, each DQ edge connection is electrically connected respectively to a DQ pin of the memory slot connector when the DIMM is fitted into the memory slot connector.

68.    The Accused DDR5 Products contain a PCB that includes "a set of address and control lines electrically connected to the third set of edge connections."

69.    For example, a Samsung DDR5 RDIMM's PCB includes a set of address and control lines, each of which is a line that is electrically connected to one designated edge connection.

70.    The Accused DDR5 Products are DIMMs comprising "a controller including a voltage monitor circuit and nonvolatile memory, the controller coupled to the PCB and to an input voltage supply line of the set of voltage supply lines."

71.    For example, a Samsung DDR5 RDIMM module comprises a controller (*e.g.*, PMIC) that includes a voltage monitor circuit and nonvolatile memory.  The PMIC, which includes a voltage monitor and nonvolatile memory, is coupled to the PCB, as shown in the annotated figure below:



72.    The Accused DDR5 Products contain a voltage monitor circuit configured to "monitor an input voltage supplied via the input voltage supply line."

73.    For example, a Samsung DDR5 RDIMM's PMIC is connected to an input voltage supply line (*e.g.*, Vin_Bulk) and includes a voltage monitor circuit to actively monitor the input voltage supply line.

74.    The Accused DDR5 Products contain a voltage monitor circuit configured to "generate a trigger signal upon detecting a trigger condition."

75.    For example, a Samsung DDR5 RDIMM's PMIC's voltage monitor circuit is configured to generate a trigger signal indicating when a Vin_Bulk overvoltage condition has occurred.

---

**12** *RDIMM*, Samsung (last visited July 28, 2025),
https://semiconductor.samsung.com/dram/module/rdimm/.

76.    The Accused DDR5 Products contain a voltage monitor circuit configured to "transmit the trigger signal to at least one other portion of the controller, wherein the controller is configured to perform, in response to the trigger signal, a write operation to write data into the nonvolatile memory, and wherein the trigger condition occurs when the input voltage exceeds a first threshold voltage."

77.    For example, a Samsung DDR5 RDIMM's PMIC's voltage monitor circuit is configured to transmit the generated trigger signal to circuitry within the PMIC, that is, the command (trigger condition) is transmitted internally to at least one other portion of the controller, which could be (1) circuitry configured to execute a power down sequence in response to the generated command, and/or (2) the generated trigger signal is captured by writing binary code into real time status registers indicating the Vin_Bulk overvoltage has occurred.  The event triggers would lead to actions that include updating memory spaces in the non-volatile memory through a write operation.

78.    The Accused DDR5 Products comprise "a set of components coupled to the PCB, the set of components including a plurality of double data rate (DDR) synchronous dynamic random access memory (SDRAM) devices coupled to the set of address and control lines and to the set of data lines, the DDR SDRAM devices being operable to receive or output data signals via the set of data lines based on address and control signals received from the system board via the set of address and control lines."

79.    For example, a Samsung DDR5 RDIMM further comprises a set of components coupled to the PCB.  These include DDR5 SDRAM memory devices, a register clock driver (RCD), PMIC, and temperature sensors.  The DDR5 SDRAM devices are coupled to (1) the set of address and control lines via the RCD, and (2) to the set of data lines for data signals.  The DDR5 SDRAM devices are configured to receive or output data signals via the set of data lines based on

address and control signals received from the output of the RCD based on the set of address and control signals received by the RCD.  Each of the DDR5 SDRAM devices include data pins connected to specific data lines of the set of data lines, and the address and control pins connected to the RCD's address and control output pins.

80.    On information and belief, the Accused DDR5 products comprise "first, second, third, a fourth converter circuits coupled to the PCB and to the input voltage supply line, and configured to receive power from the input voltage supply line and to deliver power via first, second, third, and fourth regulated voltage lines."

81.    For example, as shown below,[13] a Samsung DDR5 RDIMM's PMIC comprises circuitry that makes up four converter circuits, each of which is configured to receive power from the input voltage supply line (*e.g.*, Vin_Bulk and/or Vin_MGMT), as described above, and to deliver regulated power via first, second, third, and fourth regulated voltage lines.

---

[13] Sung Joo Park et al., *Industry's First 7.2 Gbps 512GB DDR5 Module*, Hot Chips (last visited July 28, 2025),
https://hc33.hotchips.org/assets/program/posters/HC2021.Samsung.SungJooPark.v03.pdf.



### Need to support 12V power line inside motherboard

Voltage converter for memory was located in the system and converts 12V to 1.2V and delivers power to DIMM socket directly. But 12V power line is directly connected to DIMM socket from DDR5 and built in VR converts to 1.1V, which delivers power to DRAM. As VR disappears from system, the system design has the advantage of being simplified, but on the contrary, the memory module need a lot of components. As such, the number of various components such as PMIC, Power Inductor, and MLCC will increase. From a server and network system designer's point of view, power line voltage from PSU to DIMM socket will be increased from 1.2V to 12V, so the system needs new 25V MLCC which need to be located as close to the DIMM socket as possible.



Figure2. DDR4 Based-system vs DDR5 Based-system

82.    The Accused DDR5 Products comprise a set of components that includes "a first component configured to receive power via at least the first regulated voltage line."

- 28 -

83.    For example, a Samsung DDR5 RDIMM includes components such as DDR5 SDRAM devices, RCD, Hub and temperature sensors that are specified to receive one or more of the first, second, third, and fourth regulated voltages which are generated by the first, second, third, and fourth converter circuits configured to receive power from the input voltage supply line and to deliver power via first, second, third, and fourth regulated voltage lines.  A first component may be the SPD_Hub component, which receives power via at least a first regulated voltage. Alternatively, the first component may be an SDRAM D01 component that receives power via an alternate first regulated voltage.

84.    The Accused DDR5 Products comprise a set of components that includes "a second component configured to receive power via at least the second regulated voltage line."

85.    For example, a Samsung DDR5 RDIMM includes a second component, which may be the RCD component that receives power at least via VDDIO (also referred to as VIO).  The RCD component receives two regulated voltages, VDDIO and VDD.

86.    The Accused DDR5 Products comprise a set of components that includes "a third component configured to receive power via at least the third regulated voltage line."

87.    For example, a Samsung DDR5 RDIMM includes a third component, which may be the SDRAM D02 component that receives power via at least VDD.

88.    The Accused DDR5 Products comprise a set of components that includes "a fourth component configured to receive power via at least the fourth regulated voltage line."

89.    For example, a Samsung DDR5 RDIMM includes a fourth component, which may be the SDRAM D03 component that receives power at least via VPP.

90.    The Accused DDR5 Products comprise a set of components as described above, wherein each component of the set of components "is electrically connected to one or more of the

first, second, third, and fourth regulated voltage lines" and "receives power only via the one or more of the first, second, third, and fourth regulated voltage lines."

91.     The Accused DDR5 Products comprise a plurality of DDR SDRAM devices that includes "a first group of at least five DDR SDRAM devices that are each connected to a first chip select line configured to electrically conduct a first chip select signal."

92.     For example, as shown below,[14] a Samsung DDR5 RDIMM module includes a first chip select line connected to each of a first group of at least 5 SDRAM devices (Channel A) and a second chip select line connected to each of a second group of at least 5 SDRAM devices (Channel B).  In the case of 80-bit DDR5 RDIMM, each of Channel A and Channel B are designed to receive or output 40-bit DDR data signals independently of each other by using separate chip select signal groups for Channel A and Channel B.  The SDRAMs are x4 or x8 for DDR5 RDIMMs, such that each channel includes five SDRAMs for x8 and 10 SDRAMs for x4.



---

[14] Sung Joo Park et al., *supra*.

93.     The Accused DDR5 Products comprise a plurality of DDR SDRAM devices that include "a second group of at least four DDR SDRAM devices that are each connected to a second chip select line configured to electrically conduct a second chip select signal."

94.     For example, as explained above, a Samsung DDR5 RDIMM includes a second chip select line connected to each of a second group of at least 5 SDRAM devices.

95.     In the Accused DDR5 Products, when power from the power rails of the system board is provided to the DIMM and each group of the first and second groups of DDR SDRAM devices is not in self-refresh mode, "the first group of DDR SDRAM devices is configured to be enabled, in response to the first chip select signal, to receive or output at least 40 1-bit DDR data signals in parallel via at least 40 data lines of the set of data lines independently of whether the second group of DDR SDRAM devices is enabled, in response to the second chip select signal, to receive or output an integer number of 1-bit DDR data signals in parallel via an integer number of data lines of the set of data lines."

96.     For example, a Samsung DDR5 RDIMM includes an RCD that receives a first chip select signal for Channel A and outputs a corresponding signal to the first group of SDRAM, and receives a second chip select signal for Channel B and outputs a corresponding signal to the second group of SDRAM.  When Vin_Bulk, Vin_Mgmt and ground rails are provided to the DDR5 RDIMM and received by the PMIC, the system generates the four regulated voltages that are used to power the set of components on the DIMM, including the first and second groups of DDR SDRAM.  After the initialization process, when the DDR5 RDIMM receives independent read or write commands for either Channel A or Channel B, the RCD output corresponding commands to the first or second groups of DDR SDRAM.  The output commands in turn enable Channel A or Channel B to receive or output data via data lines in accordance with executing the read or write

operation.  The self-refresh state is a deep power saving state where no access to the SDRAM is possible.

97.    In the Accused DDR5 Products, when power from the power rails of the system board is provided to the DIMM and each group of the first and second groups of DDR SDRAM devices is not in self-refresh mode, "the at least 40 1-bit DDR data signals [that are received or output in response the received C/A signals] include at least 32 1-bit wide DDR data signals and at least eight 1-bit DDR error-correcting code (ECC) data signals."

98.    For example, in a Samsung DDR5 RDIMM, the number of data lines per channel (A and B) is 40, including 32 bits of data and 8 bits of error correction data (also called error check bits).

99.    In the Accused DDR5 Products, "the sum of the at least 40 data lines and the integer number of data lines equals a total number of data conduits of the set of data conduits of the memory slot connector, and the total number of data conduits is at least 72 data conduits."

100.    For example, in a Samsung DDR5 RDIMM, each of Channel A and Channel B is designed to receive or output 40 bits of DDR data signals independently of one another by using separate chip select signals.  The sum of the data lines of Channel A and Channel B is 80 data lines, which equals a total number of data conduits of 80 data conduits, which is greater than at least 72 data conduits.

101.    On information and belief, Defendants also indirectly infringe the '366 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Defendants' customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Defendants have induced, and currently induce, infringement of the '366 Patent through their affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the Accused DDR5 Products and other materially similar products that

infringement the '366 Patent.  On information and belief, Defendants provide specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing uses of the Accused Instrumentalities and other materially similar products by users in a manner that they know or should have known would result in infringement and with the intent of inducing infringement.  On information and belief, Samsung is encouraging and facilitating infringement of the '366 Patent by others.  For example, on information and belief, Samsung sells or otherwise provides the Accused Instrumentalities to distributors or U.S.-based sales entities, including but not limited to Avnet, knowing that these entities intend to make, use, offer for sale, and/or sell the Accused Instrumentalities within the United States and/or import the Accused Instrumentalities into the United States in an infringing manner.

102.    On information and belief, Defendants also indirectly infringe the '366 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in the Eastern District of Texas and elsewhere in the United States.  For example, on information and belief, Defendants have contributed to, and currently contribute to, Defendants' customers' and end-users' infringement of the '366 Patent through their affirmative acts of selling and offering to sell, either directly or through distributors, in this District and elsewhere in the United States, the Accused DDR5 Products and other materially similar products that infringe the '366 Patent.  On information and belief, the Accused Instrumentalities and other materially similar products have no substantial noninfringing uses, and constitute a material part of the patented invention.  On information and belief, Defendants are aware that the product or process that includes the Accused DDR5 Products and other materially similar products may be covered by one or more claims of the '366 Patent.  On information and belief, the use of the product or process that includes the Accused DDR5 Products and other materially similar products infringes at least one claim of the '366 Patent.

103.    Samsung's infringement of the '366 Patent has damaged and will continue to damage Netlist.  Samsung has had actual notice of the '366 Patent and its infringement since at least the filing of this Complaint but as early as the '366 Patent issuing.  Samsung's infringement of the '366 Patent is willful.  Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its action constituted an unjustifiably high risk of infringement.  For instance, Samsung admitted on July 11, 2025 in one of its duplicative, second-filed declaratory judgment suits in Delaware, *Samsung Elecs. Co. v. Netlist, Inc.*, C.A. No. 25-626 (D. Del.), that it was actively monitoring Netlist's patent applications weeks before the patents issued. *Samsung Elecs. Co., Ltd. v. Netlist, Inc.*, C.A. No. 23-1122 (D. Del. July 11, 2025), Dkt. No. 30 at 5 & n.2 ("Samsung intends to file . . . a claim for declaratory judgment of non-infringement of any patent that issues from [Netlist's] '017 application in this Court"; "Samsung intends to seek a declaratory judgment of non-infringement of any patent that issues from [Netlist's] '797 application in this Court."). The morning before the '366 Patent issued from the '797 application, Samsung's counsel emailed Netlist's counsel identifying its intention "to move for leave to amend its Complaint in C.A. No. 25-626 to add Avnet, Inc. as a plaintiff and to add declaratory judgment claims regarding U.S. Patent No. 10,025,731 and U.S. Patent No. 12,373,366." *See* Case No. 2:25-cv-557, Dkt. 135-02 at 1.

104.    Avnet's infringement of the '366 Patent has damaged and will continue to damage Netlist.  Avnet has had actual notice of the '366 Patent since at least the filing of this Complaint. Avnet's infringement of the '366 Patent is willful.  Avnet continues to commit acts of infringement, including advertising, marketing, offering to sell and/or selling the Accused Instrumentalities, despite a high likelihood that its actions constitute infringement, and Avnet knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## V.     SECOND CLAIM FOR RELIEF – '608 Patent

105.     Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

106.     The '608 Patent is already pending before this Court.  Samsung has in the past attempted to flee the jurisdiction by filing declaratory judgment actions in another Court.  In the excess of caution, Plaintiff presents its claim on the '608 patent to emphasize that the infringement of the '608 patent by Samsung is already before this Court.

107.     Upon information and belief, Defendants directly infringed and are currently infringing at least one claim of the '608 Patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the Accused DDR5 DIMMs, and other products with materially the same structure in relevant part. For example, and as shown below, the accused DDR5 MRDIMMs and other products with materially the same structures in relevant parts infringe at least one claim of the '608 Patent.

108.     The allegations below are based upon Netlist's current information and belief. Internal documentation from Defendants, including confidential Samsung product specifications and source code, will show infringement.  The examples provided below are not intended to be, and should not be understood as, limiting in any way.

109.     To the extent the preamble is limiting, the Accused DDR5 Products are DIMMs "operable to communicate with a memory controller via a memory bus, the memory bus including signal lines, the signal lines including a set of control/address signal lines and a plurality of sets of data/strobe signal lines, the memory module."

110.    For example, a Samsung's DDR5 MRDIMMs (also called MCRDIMMs[15]) are each a dual inline memory module.

111.    The Accused DDR5 MRDIMM memory modules are operate to communicate (e.g., through read or write operations) with a memory controller (e.g., one in a host computer's CPU) via a memory bus (e.g., as a pathway between a CPU and DRAMs for data communication, which would go through a memory slot in the case of communication between a memory controller and a DIMM). For example, the term "Memory Bus" may "refer[] to the data pathway between the central processing unit (CPU) and the computer's main memory (RAM)." DevX Memory Bus Definition at 2. A memory bus can "serve[] as the communication channel that enables these two critical components [CPU and RAM] to exchange information, ensuring the efficient functioning of the computer." *See also,* ("Samsung has developed a Multi-Ranked Buffered Dual In-Line Memory Module (MCRDIMM), which provides more memory and bandwidth ***without increasing memory slots on the server board.*** . . . ***MCRDIMM enables CPU to access two ranks of memory simultaneously on a single DIMM*** with a chip-set layout of two identical DDR5 DIMMS. The benefit of this approach is that the DRAM devices are not expected to operate at a faster clock frequency. By accessing two DRAM devices at the same time, the CPU can effectively double the memory bandwidth coming from the DIMM. Accessing the two DRAM devices is accomplished by using a special mux data buffer resident on the DRAM, which allows for simultaneous access to both DIMMs thereby ***doubling the data rate to the host.***" Samsung's first-generation MCRDIMMs offer data transfer rates of up to 8.8 Gb/s. Samsung is currently sampling 16 GB

---

[15] ("Montage HK Stock Exchange Application Proof") at 43 (describing "MRDIMM" as "multiplexed rank dual in-line memory module, a high-bandwidth server memory module based on the DDR5 LRDIMM architecture adopting the '1+10' design consisting of one MRCD chip and 10 DB chips, which, compared with RDIMM and LRDIMM, enables simultaneous access to two memory arrays on the module and effectively doubles the bandwidth; the first generation of MRDIMM is also referred to MCRDIMM by some manufacturers.").

Mono MCRDIMM devices with enhanced performance, capacity, and power consumption. With this innovative memory solution, Samsung is advancing the next frontier for Artificial Intelligence (AI), Machine Learning (ML), and Large Language Model (LLM) processing").

112. The communication of the data signals between the memory controller and the DDR5 SDRAMs would be via a memory bus because memory bus refers to the data pathway between a CPU and SDRAMs. The memory bus includes signal lines, which include a set of control/address signal lines and a plurality of sets of data/strobe signal lines. For example, the MRCD chip on Samsung's MRDIMM "buffers and re-drives the address, command, clock and control signals from the memory controller." (M88MR5RCD01 (Gen1 DDR5 MRCD)) at 1. As seen in the illustration, the address, command, clock and control signals from the memory controller are received by the MRCD via the edge connections along the corresponding signal lines. As also illustrated, a MRDIMM like that of Samsung's MRDIMM, receives data/strobe signals from DDR5 memory controller, along corresponding data/strobe signal lines.

113. The Accused DDR5 Products are MRDIMMs comprising "a module board having edge connections for coupling to respective signal lines in the memory bus."

114. For example, MRDIMM features "Utilization of standard DDR5 DIMM components including DRAM, DIMM Form Factor & Pinout, SPD, PMIC, and TS for ease of adoption." (JEDEC Unveils Plans for DDR5 MRDIMM) at 1. As shown in Samsung DDR5 RDIMM datasheet, the pins are each coupled to a corresponding signal line in the memory bus:

[Table 5] PIN Description

| Pin Name | Description |
|---|---|
| CA[6:0]_A<br>CA[6:0]_B | SDRAM Address and Command Bus |
| CS[1:0]_A<br>CS[1:0]_B | SDRAM Chip Select |
| PAR_A<br>PAR_B | SDRAM Parity input |
| CK_t | SDRAM Clocks (true/positive) |
| CK_c | SDRAM Clocks (complement/negative) |
| ALERT_n | SDRAM alert for CRC error |
| RESET_n | Set DRAM to known state |
| PCAMP | Control and Monitor Port |
| HSCL | I2C/I3C-Basic Host Sideband Bus Clock |
| HSDA | I2C/I3C-Basic Host Sideband Bus Data |
| HSA | I2C/I3C-Basic Host Sideband Bus Address |
| LBDQ | Loopback data output: |

| Pin Name | Description |
|---|---|
| DQ[31:0]_A<br>DQ[31:0]_B | DIMM memory data bus channel A and B |
| CB[7:0]_A<br>CB[7:0]_B | DIMM ECC check bits(CB) channel A and B |
| DQS[9:0]_A_t<br>DQS[9:0]_B_t | SDRAM data strobes<br>(positive line of differential pair) |
| DQS[9:0]_A_c<br>DQS[9:0]_B_c | SDRAM data strobes<br>(negative line of differential pair) |
| TDQS[9:5]_A_t<br>TDQS[9:5]_B_t | Not valid for x4 operation.<br>Enabled via Mode Register. |
| TDQS[9:5]_A_c<br>TDQS[9:5]_B_c | Not valid for x4 operation.<br>Enabled via Mode Register. |
| VIN_BULK | DIMM Power Supply from system to PMIC |
| VIN_MGMT | DIMM Power Supply from system to PMIC |
| VSS | Power supply return (ground) |
| RFU | Reserved for future use |
| LBDQS | Loopback data strobe output |

NOTE :
1) TDQSx and DQSx_t share a pin.

16

115.   By way of further example, there are signal pathways from the DDR5 memory controller to the edge connections and then to RCD and MDBs:

116.   The Accused DDR5 MRDIMMs contain "a module control device mounted on the module board and configured to receive system command signals for memory operations via the set of control/address signal lines and to output module command signals and module control signals in response to the system command signals."

117.   For example, Samsung's DDR5 MRDIMMs contain a Multiplexed Rank Registering Clock Driver (MRCD) mounted on the module board. The MRCD is configured to receive system command signals for memory operations via the set of control/address signal lines. For example, Samsung's supplier, Montage, describes its MRCD as handling "buffer[ing] and re-driv[ing] the address, command, clock, and control signals from the memory controller," which means the MRCD is designed to receive the address/**command**/clock/control signals from the

---

[16] (Samsung DDR5 RDIMM Datasheet), at 9 (available at https://share.google/6OUBffRZs5r5PFYz6).

memory controller or otherwise it would not be able to buffer or re-drive those signals. *See* (M88MR5RCD01 (Gen1 DDR5 MRCD)). Further, Command, or "CMD," is specifically identified as one of the signals received by the MRCD from the Memory Controller

118.    Further, the system command signals are received by the MRCD via the C/A and CS signal lines from the memory controller. For example, the signals would be received via the corresponding signal lines, which as explained above, are in turn coupled to the associated pins, such as the C/A and CS pins on the edge connector**:**

[Table 5] PIN Description

| Pin Name | Description |
|---|---|
| CA[6:0]_A CA[6:0]_B | SDRAM Address and Command Bus |
| CS[1:0]_A CS[1:0]_B | SDRAM Chip Select |
| PAR_A PAR_B | SDRAM Parity input |
| CK_t | SDRAM Clocks (true/positive) |
| CK_c | SDRAM Clocks (complement/negative) |
| ALERT_n | SDRAM alert for CRC error |
| RESET_n | Set DRAM to known state |
| PCAMP | Control and Monitor Port |
| HSCL | I2C/I3C-Basic Host Sideband Bus Clock |
| HSDA | I2C/I3C-Basic Host Sideband Bus Data |
| HSA | I2C/I3C-Basic Host Sideband Bus Address |
| LBDQ | Loopback data output： |

| Pin Name | Description |
|---|---|
| DQ[31:0]_A DQ[31:0]_B | DIMM memory data bus channel A and B |
| CB[7:0]_A CB[7:0]_B | DIMM ECC check bits(CB) channel A and B |
| DQS[9:0]_A_t DQS[9:0]_B_t | SDRAM data strobes (positive line of differential pair) |
| DQS[9:0]_A_c DQS[9:0]_B_c | SDRAM data strobes (negative line of differential pair) |
| TDQS[9:5]_A_t TDQS[9:5]_B_t | Not valid for x4 operation. Enabled via Mode Register. |
| TDQS[9:5]_A_c TDQS[9:5]_B_c | Not valid for x4 operation. Enabled via Mode Register. |
| VIN_BULK | DIMM Power Supply from system to PMIC |
| VIN_MGMT | DIMM Power Supply from system to PMIC |
| VSS | Power supply return (ground) |
| RFU | Reserved for future use |
| LBDQS | Loopback data strobe output |

NOTE :
1) TDQSx and DQSx_t share a pin.

(Samsung DDR5 RDIMM Datasheet, at 9)

119.    The Accused DDR5 MRDIMMs also contain a "module control device being further configured to receive a system clock signal and output a module clock signal."

120.    For example, the MRCD receives and "re-drives" clock signals. (M88MR5RCD01 (Gen1 DDR5 MRCD)). Further, Clock or "CLK," is specifically identified as one of the signals received by the MRCD from the Memory Controller: *See also* Samsung DDR5 RDIMM Datasheet, at 9:

**[Table 5] PIN Description**

| Pin Name | Description |
|---|---|
| CA[6:0]_A<br>CA[6:0]_B | SDRAM Address and Command Bus |
| CS[1:0]_A<br>CS[1:0]_B | SDRAM Chip Select |
| PAR_A<br>PAR_B | SDRAM Parity input |
| CK_t | SDRAM Clocks (true/positive) |
| CK_c | SDRAM Clocks (complement/negative) |
| ALERT_n | SDRAM alert for CRC error |
| RESET_n | Set DRAM to known state |
| PCAMP | Control and Monitor Port |
| HSCL | I2C/I3C-Basic Host Sideband Bus Clock |
| HSDA | I2C/I3C-Basic Host Sideband Bus Data |
| HSA | I2C/I3C-Basic Host Sideband Bus Address |
| LBDQ | Loopback data output: |

| Pin Name | Description |
|---|---|
| DQ[31:0]_A<br>DQ[31:0]_B | DIMM memory data bus channel A and B |
| CB[7:0]_A<br>CB[7:0]_B | DIMM ECC check bits(CB) channel A and B |
| DQS[9:0]_A_t<br>DQS[9:0]_B_t | SDRAM data strobes<br>(positive line of differential pair) |
| DQS[9:0]_A_c<br>DQS[9:0]_B_c | SDRAM data strobes<br>(negative line of differential pair) |
| TDQS[9:5]_A_t<br>TDQS[9:5]_B_t | Not valid for x4 operation.<br>Enabled via Mode Register. |
| TDQS[9:5]_A_c<br>TDQS[9:5]_B_c | Not valid for x4 operation.<br>Enabled via Mode Register. |
| VIN_BULK | DIMM Power Supply from system to PMIC |
| VIN_MGMT | DIMM Power Supply from system to PMIC |
| VSS | Power supply return (ground) |
| RFU | Reserved for future use |
| LBDQS | Loopback data strobe output |

NOTE :
1) TDQSx and DQSx_t share a pin.

121.    The Accused DDR5 MRDIMMs also contain "memory devices mounted on the module board and configured to receive the module command signals and the module clock signal, and to perform the memory operations in response to the module command signals, the memory devices including a plurality of sets of memory devices corresponding to respective sets of the plurality of sets of data/strobe signal lines."  As shown below, there are a total of 40 DRAMs mounted on the PCB, with 20 on the back and 20 on the front, with each side of the MRDIMM having two rows of 10 DRAMs. As also shown below, there are ten MDBs, which each have four associated x4 SDRAMs, which form a set of memory devices:







122.    These memory devices are configured to receive the module command signals and the module clock signal from the MRCD. For example, the MRCD include "Two pseudo-channels splitting the incoming CA inputs and generating separate CA outputs." See e.g., M88MR5RCD01 (Gen1 DDR5 MRCD)). Those CA outputs are sent to and received by the memory devices, as evidenced by the "re-driving of  address, command, clock, and  control signals . . . between the memory controller and DRAM chips." (Montage Technology Delivers Gen2 MRCD & MDB Engineering Samples for DDR5 MRDIMM) at 1.

123.    The Accused DDR5 MRDIMMs also contain a "a plurality of buffer circuits corresponding to respective sets of the plurality of sets of data/strobe signal lines wherein each respective buffer circuit of the plurality of buffer circuits is mounted on the module board coupled between a respective set of data/strobe signal lines and a respective set of memory devices."  For example, the Accused MRDIMM contain ten Multiplexed Data Buffers (MDBs) on the PCB, with

six on the front and four on the back. In conjunction with the MRCD, the MDBs buffer and re-drive data and strobe signals from the memory controller or the DRAM devices. *See* M88MR5DB01 (Gen1 DDR5 MDB)). As shown above, each of the ten MDBs is coupled between a respective set of data/strobe signals and a respective set of (four) memory devices. *See also*, *e.g.*, (M88MR5DB01 (Gen1 DDR5 MDB)) at 1 (Each MDB chip "incorporates a dual-nibble host interface," meaning that it is coupled to 8 DQ lines and two pairs of DQS signals on the host side; as well as a "DRAM side [that] features four nibbles, with two allocated to each pseudo-channel," meaning that each MDB is associated with four DRAMs).

124.    The data buffers in the Accused DDR5 MRDIMMs are each "configured to receive the module control signals and the module clock signal." For example, the MRCD chip is configured to output module control signals (*e.g.*, BCOM signals to MDBs). *See* (M88MR5RCD01 (Gen1 DDR5 MRCD)) (the MRCD chip's features include "[i]ntegrated BCOM bus to control the multiplexed data buffers (MDB).).

125.    The "each respective buffer circuit [in the Accused DDR5 MRDIMMs] including a data path corresponding to each data signal line in the respective set of data/strobe signal lines." For example, Montage's press release states that its "***MDB chips manage data traffic between the memory controller and DRAM chips***." *See* (Montage Technology Delivers Gen2 MRCD & MDB Engineering Samples for DDR5 MRDIMM) at 1. Further, each of the MDB chips features "a dual-nibble host interface that operates at twice the speed of the DRAM interface," and a "DRAM side [that] features four nibbles, with two allocated to each pseudo-channel. The MDB efficiently multiplexes two DRAM-side DQ signals into one host-side DQ signal." (M88MR5DB01 (Gen1 DDR5 MDB)) at 1. This indicates that there is a data path corresponding to each of the DQ signal lines in the respective set of the DQ/DQS signal lines, over which two DRAM-side DQ signals are multiplexed into one host-side DQ signal, which is carried over one DQ signal line.

126.    The data buffers in the Accused DDR5 MRDIMMS are each "a command processing circuit configured to decode the module control signals and to control the data path in accordance with the module control signals and the module clock signal." As explained above, the MRCD chip's features include "*[i]ntegrated BCOM bus* to control the multiplexed data buffers (MDB)." *See* (M88MR5RCD01 (Gen1 DDR5 MRCD)) at 1.  For example, the MDB needs to be able to differentiate, between read and write operations so that it can activate the appropriate pairs of receivers and transmitters to drive the data in the right direction (*e.g.*, towards the memroy devices in a write operation and towards the host in a read operation), to differentiate between normal read/write mode and training mode (so it will know whether to drive the receiver circuits to receive data from the host or to use internally generated training patterns and activate the mechanisms for read/write training), and to determine whether the MRDIMM should operate in a rank mode that receives and outputs data from just one rank of memory devices or to operate in a mux mode that requires multiplexing or demultiplexing data for or from two ranks of memory devices, among other differentiators. Furthermore, because Montage's MDB chips "manage data traffic between the memory controller and DRAM devices." (Montage Technology Delivers Gen2 MRCD & MDB Engineering Samples for DDR5 MRDIMM) at 1, and because the data traffic is transmitted over respective data paths corresponding to respective DQ signal lines (each signal line carrying one bit of DQ each time), the command processing circuit is also configured to control the data paths corresponding to the respective DQ signal lines. The data paths would be controlled in accordance with the module control signals that determine *e.g.*, whether the signals indicating a read or write operation, as well as a module clock signal to determine the timing of the enabling and disabling of the data paths.

127.    The Accused DDR5 MRDIMMS also include "the data path corresponding to the each data signal line [which] includes at least one tristate buffer controlled by the command

processing circuit." For example, the draft MDB01 Specification contemplates DQ receivers that can be disabled by the MDB during BCOM training mode. *See*, *e.g.*, (MDB01 Spec. Rev. 0.7) at 99 ("On the Host interface, while in BCOM training mode, the DB continuously enables its DQ drivers, and ***disables its DQ receivers and DQ termination (DQ_RTT_PARK).*** Also, the Data Buffer disables its DQS drivers and receivers. It applies DQS_RTT_PARK continuously on DQS if enabled."). In addition, Section 3.5 of the draft MDB01 Specification notes the DQ/DQS can be configured as float (Hi-Z). *Id.* at 35 ("In the Power-on RESET state ***all Strobe and Data input receivers are disabled and can be left floating***."). Since the DQ receivers on the data paths can assume enabled, disabled and floating states, they are likely to include a tristate control logic such as a tristate buffer. Likewise the DQ drivers can also have a tristate buffer because the DQ outputs must float during initial power up and it is required to be disabled within tBCOMMTM_Exit. *See*, (MDB01 Spec. Rev. 0.7) at 35 ("All Strobe and Data Output must float"), at 99 ("As shown in Figure 49, the Data Buffer device is required to disable the DQ outputs within tBCOMM_Exit after executing a BCOMMTM Exit strap command."). Thus, it can assume three states: on, off, and float. The state of the tristate buffer(s) would be controlled by the output of the command processing circuit. For example, as the draft MDB01 Specification notes, the two pseudo channels of memory devices cannot transfer data in opposite directions because they share data and strobe signals on the host side. See (MDB01 Spec. Rev. 0.7) at 29.

128.    The Accused DDR5 MRDIMMS also include "a delay circuit configured to delay a signal through the data path by an amount determined by the command processing circuit in response to at least one of the module control signals." For example, according to the draft MDB01 Specification, in the mux mode, read and write operations both must meet the data buffer latencies for each rank and pseudo channel. (MDB01 Spec. Rev. 0.7) at 84. This indicates that there is a delay circuit that adds additional delay amount DWL and MRE on top of an SDRAM's CAS write

latency and CAS latency. Furthermore, the specification provides for "per lane" precise delay adjustments, indicating that each data path is associated with an individual delay circuit, to allow for "fine-grained adjustment of individual bit lane delay differences." (MDB01 Spec. Rev. 0.7) at 115–116.

129.    On information and belief, Defendants also indirectly infringe the '608 Patent, as provided in 35 U.S.C. § 271(b), by inducing infringement by others, such as Defendants' customers and end users, in this District and elsewhere in the United States.  For example, on information and belief, Defendants have induced, and currently induce, infringement of the '608 Patent through their affirmative acts of selling, offering to sell, distributing, and/or otherwise making available the Accused DDR5 Products and other materially similar products that infringement the '608 Patent.  On information and belief, Defendants provide specifications, datasheets, instruction manuals, and/or other materials that encourage and facilitate infringing uses of the Accused Instrumentalities and other materially similar products by users in a manner that they know or should have known would result in infringement and with the intent of inducing infringement.  On information and belief, Samsung is encouraging and facilitating infringement of the '608 Patent by others.  For example, on information and belief, Samsung sells or otherwise provides the Accused Instrumentalities to distributors or U.S.-based sales entities, including but not limited to Avnet, knowing that these entities intend to make, use, offer for sale, and/or sell the Accused Instrumentalities within the United States and/or import the Accused Instrumentalities into the United States in an infringing manner.

130.    On information and belief, Defendants also indirectly infringe the '608 Patent, as provided in 35 U.S.C. § 271(c), contributing to direct infringement committed by others, such as customers and end users, in the Eastern District of Texas and elsewhere in the United States.  For example, on information and belief, Defendants have contributed to, and currently contribute to,

Defendants' customers' and end-users' infringement of the '608 Patent through their affirmative acts of selling and offering to sell, either directly or through distributors, in this District and elsewhere in the United States, the Accused DDR5 Products and other materially similar products that infringe the '608 Patent. On information and belief, the Accused Instrumentalities and other materially similar products have no substantial noninfringing uses, and constitute a material part of the patented invention. On information and belief, Defendants are aware that the product or process that includes the Accused DDR5 Products and other materially similar products may be covered by one or more claims of the '608 Patent. On information and belief, the use of the product or process that includes the Accused DDR5 Products and other materially similar products infringes at least one claim of the '608 Patent.

131.    Samsung's infringement of the '608 Patent has damaged and will continue to damage Netlist. Samsung has had actual notice of the '608 Patent and its infringement as discussed in Paragraph 25 and since at least the filing of this Complaint. Samsung's infringement of the '608 Patent is willful. Samsung continues to commit acts of infringement despite a high likelihood that its actions constitute infringement, and Samsung knew or should have known that its action constituted an unjustifiably high risk of infringement.

132.    Avnet's infringement of the '608 Patent has damaged and will continue to damage Netlist. Avnet has had actual notice of the '608 Patent and its infringement since at least the filing of this Complaint. Avnet's infringement of the '608 Patent is willful. Avnet continues to commit acts of infringement, including advertising, marketing, offering to sell and/or selling the Accused Instrumentalities, despite a high likelihood that its actions constitute infringement, and Avnet knew or should have known that its actions constituted an unjustifiably high risk of infringement.

## VI.    THIRD CLAIM FOR RELIEF – Declaratory Judgment of No Unlawful Scheme to Acquire and Exploit Monopoly Power in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2

133.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

134.    Netlist denies that any anti-trust markets exist for anti-trust purposes as it relates to Netlist's actions ("Relevant Markets").

135.    To the extent any Relevant Markets exist, Netlist has no market power in any Relevant Markets. Netlist and Samsung have repeatedly asserted that Netlist patents are not essential to any JEDEC Standard. Indeed, Samsung conceded in EDTX I that none of the patents-in-suit were standard essential. EDTX I, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; see also id., at 147:1-6 ("[The Court: there are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); see also EDTX II, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."). As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard. EDTX I, Dkt. 550, at 25. Nor are the claims of the '366 Patent or '608 Patent essential to any JEDEC standard. Thus, Netlist could not have excluded competition much less held power to charge supra-competitive prices. As a result, Netlist has not acquired or maintained any monopoly power as a result of Netlist's involvement in JEDEC.

136.    Netlist met any JEDEC disclosure duty that existed and did not fail to disclose its patents JEDEC committees as essential or potentially essential to JEDEC committees. For example, Netlist disclosed family members of the '366 Patent to JEDEC. There is no obligation to disclose a patent that is not standard essential. See JEDEC Manual No. 21T § 8.2.4 (". . . each

Committee Member . . . agrees to offer to license on RAND terms . . such Committee Member's Essential Patent Claims . . ."); *id.* at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard"). This is further confirmed by testimony of Samsung's JEDEC representative (and corporate representative in deposition on JEDEC), who testified that JEDEC does not obligate companies to disclose essential patents.

137.    Netlist did not deceive JEDEC or the industry by withdrawing or later rejoining JEDEC.

138.    Netlist has no leverage over manufacturers of standard-compliant products.

139.    Because a patent claim must be supported by the specification, Netlist did not use its membership in JEDEC committees to gather information about the technologies that would ultimately be incorporated into the JEDEC standards, file continuation applications on related patents and prosecute claims that allegedly read on the JEDEC standards, and then assert those purported SEPs against the industry. The USPTO issued Netlist patents because the concepts it created were novel, non-obvious and properly disclosed. Netlist has not acquired any monopoly power by improperly obtaining patents for technologies that Netlist did not invent.

140.    Netlist's lawful activities have not caused customers in any Relevant Markets, such as Samsung, or customers in the downstream market to face higher costs for access to DIMM technologies. Rather, Samsung chose to breach the JDLA and willfully infringe Netlist's patents.

141.    Any such claim is barred by the statute of limitations.

142.    Samsung has no anti-trust standing and has not suffered anti-trust injury,

143.    Accordingly, Netlist is entitled to a declaration that it has not violated the anti-trust laws.

144.     Samsung cannot satisfy any of the elements for such a claim.

## VII.     **FOURTH CLAIM FOR RELIEF – Declaratory Judgment of No Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

145.     Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

146.     Netlist denies that any Relevant Markets exist for anti-trust purposes.

147.     To the extent any Relevant Markets exist, Netlist has not attempted to acquire or exploit market power in any Relevant Markets related to JEDEC-compliant DIMMs. Netlist and Samsung have repeatedly asserted that Netlist patents are not essential to any JEDEC Standard. Indeed, Samsung conceded in EDTX I that none of the patents-in-suit were standard essential. EDTX I, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; see also id., at 147:1-6 ("[The Court: there are no standard essential patents, there's no third-party beneficiary enforcement of a RAND obligation, and that largely negates the relevance of JEDEC."); *see also EDTX II*, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."). As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard. *EDTX I*, Dkt. 550, at 25. Nor are the claims of the '366 Patent, '608 Patent essential to any JEDEC standard. Thus, Netlist could not have created a probability of excluding competition much less held power to charge supra-competitive prices. As a result, Netlist has not attempted to acquire or maintain any monopoly power as a result of Netlist's involvement in JEDEC.

148.     Netlist conduct at JEDEC has not created any probability of achieving monopoly power. Netlist met any JEDEC disclosure duty that existed and did not fail to disclose its patents JEDEC committees as essential or potentially essential to JEDEC committees. For example, Netlist disclosed family members of the '366 Patent to JEDEC. There is no obligation to disclose

a patent that is not standard essential. JEDEC Manual No. 21T § 8.2.4 (". . . each Committee Member . . . agrees to offer to license on RAND terms . . such Committee Member's Essential Patent Claims . . ."); *id*. at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard"). This is further confirmed by testimony of Samsung's JEDEC representative (and corporate representative in deposition on JEDEC), who testified that JEDEC does not obligate companies to disclose essential patents. Thus, Netlist has not attempted to acquire monopoly power through improper, exploitative means.

149.    Netlist has not attempted to exploit any market power by using its membership in JEDEC committees to gather information about the technologies that would ultimately be incorporated into the JEDEC standards, file continuation applications on related patents and prosecute claims that allegedly read on the JEDEC standards, and then assert those purported SEPs against the industry because patent claims are limited by the specification. The USPTO issued Netlist patents because the concepts it created were novel, not obvious, and properly disclosed. Netlist has not acquired any monopoly power by improperly obtaining patents for technologies that Netlist did not invent.

150.    Netlist's lawful activities have not caused customers in the Relevant Market, such as Samsung, or customers in the downstream market to face a dangerous probability of a distorted market, such as higher costs for access to DIMM technologies. Rather, Samsung chose to breach the JDLA and willfully infringe Netlist's patents.

151.    Samsung has no anti-trust standing and has not suffered anti-trust injury,

152.    Any such claim is barred by the statute of limitations.

153.    Accordingly, Netlist is entitled to a declaration that it has not attempted to monopolize the market for technologies covered by any JEDEC standard.

154.    Samsung cannot satisfy any of the elements for such a claim.

## VIII.  FIFTH CLAIM FOR RELIEF – Declaratory Judgment of No Breach of RAND Obligations

155.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

156.    Any allegation that Netlist has breached any RAND obligation under JEDEC's Patent Policy for the Patents-in-Suit is barred by the statute of limitations.

157.    Netlist has not breached any RAND obligation under JEDEC's Patent Policy, which only applies to "Essential Patent Claims." JEDEC Manual No. 21T § 8.2.4 (". . . each Committee Member . . . agrees to offer to license on RAND terms . . such Committee Member's Essential Patent Claims . . ."); *id.* at 31 (defining "Essential Patent Claims" as "[t]hose Patent claims the use of which would necessarily be infringed by the use, sale, offer for sale or other disposition of a portion of a product in order to be compliant with the required portions of a final approved JEDEC standard").

158.    Samsung conceded in *EDTX I* that none of the patents-in-suit were standard essential. EDTX I, Dkt. 427 (PTC Tr.), at 146:1-7, 192:22-24, and 193:6-10; *see also id.*, at 147:1-6 ("[T]he Court: there are no standard essential patents, ***there's no third-party beneficiary enforcement of a RAND obligation***, and that largely negates the relevance of JEDEC."); *see also EDTX II*, Dkt. 818 at 2 (E.D. Tex. Nov. 6, 2024) ("The Parties stated on the record that … the ''608 Patent' … [is] not standard essential …."). As this Court further previously found, "[a]t the time of trial, Netlist asserted infringement based on a comparison of the claims of the asserted patents to Samsung's accused products," not the JEDEC standard. *EDTX I*, Dkt. 550, at 25. Nor are the claims of the '366 Patent or the '608 Patent essential to any JEDEC standard.

159.    Netlist has negotiated and offered a license in compliance with RAND.

160.    Samsung is not a willing licensee; rather Samsung has acted in bad faith, including materially breaching the JDLA, and willfully infringing Netlist's patents, thus eliminating any right Samsung would have had to a RAND license, if one existed.

161.    Because RAND obligations do not apply to the Patents-in-Suit, Netlist is not in breach of any RAND obligations.

162.    To the extent RAND obligations do exist, Netlist has complied with all RAND obligations.

163.    Any such claim is barred by the statute of limitations.

164.    Accordingly, Netlist is entitled to a declaration that it has not breached any RAND obligations.

165.    Samsung cannot satisfy any of the elements for such a claim.

## IX.    SIXTH CLAIM FOR RELIEF – Declaratory Judgment of No Unfair Competition Under Cal. Bus. & Prof. Code § 17200

166.    Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this First Amended Complaint as if fully set forth herein.

167.    Netlist has not engaged in any unfair competition under Cal. Bus. & Prof. Code § 17200, including (a) any unlawful business acts or practices in violation of Section 2 of the Sherman Act (*see supra* Fourth and Fifth Claims for Relief), (b) any unfair conduct by failing to disclose patents to JEDEC Committees or satisfying its RAND obligations (*see supra* Sixth Claim for Relief), (c) obtaining its patents through improper derivation—claiming as its own the work of other JEDEC members (*see supra* Fourth and Fifth Claims for Relief), (d) knowingly asserting invalid patents in litigation against Samsung, or (e) seeking injunctive relief against Samsung for Samsung's infringement of Netlist's Patents.

168.    Any such claim is barred by the statute of limitations.

169.    Accordingly, Netlist is entitled to a declaration that it is not in violation of California Business & Professions Code § 17200.

170.    Samsung cannot satisfy any of the elements for such a claim.

## X.    **DEMAND FOR JURY TRIAL**

171.    Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule CV-38, Netlist demands a trial by jury on all issues triable to a jury.

## XI.    **PRAYER FOR RELIEF**

WHEREFORE, Netlist respectfully requests that this Court enter judgment in its favor ordering, finding, declaring, and/or awarding Netlist relief as follows:

A.    that Defendants infringe the Patents-in-Suit;

B.    all equitable relief the Court deems just and proper as a result of Defendants' infringement;

C.    an award of damages resulting from Defendants' acts of infringement in accordance with 35 U.S.C. § 284;

D.    that Samsung's infringement of the Patents-in-Suit is willful;

E.    that Avnet's infringement of the Patents-in-Suit is willful;

F.    a declaration that Netlist has not violated Section 2 of the Sherman Act, 15 U.S.C. § 2 by engaging in an unlawful scheme to acquire or exploit monopoly power;

G.    a declaration that Netlist's patents asserted against Samsung are not unenforceable because Netlist has not engaged in a scheme to acquire or exploit monopoly power through enforcement of these patents;

H.    a declaration that Netlist has not violated California Business and Professions § 17200 based on fraudulent and/or unfair conduct;

I.      a declaration that Netlist is not liable for breach of contract under JEDEC Patent Policy by demanding unreasonable and discriminatory royalties for a license to standard-essential patents;

J.      enhanced damages pursuant to 35 U.S.C. § 284;

K.      that this is an exceptional case and awarding Netlist its reasonable attorneys' fees and costs pursuant to 35 U.S.C. § 285;

L.      an accounting for acts of infringement and supplemental damages, without limitation, prejudgment and post-judgment interest; and

M.      in the alternative to an award of damages under 35 U.S.C. § 284, an order pursuant to 35 U.S.C. § 283 permanently enjoining Defendants, their distributors, officers, agents, servants, employees, attorneys, instrumentalities, and those persons in privity, active concert, or participation with them, from further acts of direct and/or indirect infringement of the Patents-in-Suit, including the manufacture, sale, offer for sale, importation, and/or use of the Accused Instrumentalities.

N.      such other equitable relief which may be requested and to which Netlist is entitled.

Dated: March 2, 2026

Respectfully submitted,

*/s/ Blair A. Silver*

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Jason G. Sheasby (*pro hac vice*)
jsheasby@irell.com
Andrew J. Strabone (*pro hac vice*)
astrabone@irell.com
Blair A. Silver
DC Bar 1000372
bsilver@irell.com
Michael W. Tezyan (*pro hac vice*)
mtezyan@irell.com
Andrew H. Henderson (*pro hac vice*)
dhenderson@irell.com
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

***Attorneys for Plaintiff Netlist, Inc.***